SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

## Robert Dublirer v. 2000 Linwood Avenue Owners, Inc., et al. (A-125-11) (069154)

**Argued September 8, 2014 -- Decided December 3, 2014**

**RABNER, C.J., writing for a unanimous Court.**

In this appeal, the Court considers the free speech rights of residents in a high-rise cooperative apartment building.

Defendant 2000 Linwood Avenue Owners, Inc., owns a high-rise apartment building in Fort Lee known as Mediterranean Towers South or Med South. Med South is a private cooperative apartment building, commonly referred to as a "co-op." In a co-op arrangement, residents buy shares of the building and they occupy their apartments as leaseholders. Med South, governed by a Board of Directors, is home to about 1000 to 1200 residents who live in 483 units. The shareholders or residents of a common-interest community like Med South agree to be bound by the co-op's by-laws and rules. Plaintiff Robert Dublirer bought shares in Med South and became a resident in 2002. Dublirer, a regular critic of the building's Board of Directors, was interested in running for a Board seat and asked the Board if he could distribute campaign materials in the building.

The Board, citing a "House Rule" that barred soliciting and distributing any written materials, denied Dublirer's request. According to the Board, the rule has two aims: to preserve the residents' quiet enjoyment of their apartments and to cut down on litter or "paper pollution." There are several exceptions to the House Rule. The Board itself distributes various documents under apartment doors, including written "updates" that criticize the Board's opponents. In addition, the Board permits shareholders to knock on doors to solicit proxies for the annual shareholders' meeting, but shareholders may not discuss issues or candidates as they do so.

Dublirer publishes the "Med South Gadfly," a newsletter that he distributes at pubic shareholder meetings twice a year. The House Rule bars Dublirer and others from placing a newsletter under a neighbor's door. Residents can post items on the bulletin board in the rear lobby of the building and can distribute materials at two annual board meetings that shareholders attend. They can also send documents to fellow shareholders by regular mail, at a cost of more than $200 per mailing. In addition, residents may seek the Board's approval to place signs or notices in the building, but there do not appear to be any written guidelines to channel the Board's discretion.

Dublirer filed a complaint in the Chancery Division on March 25, 2008. He challenged the House Rule and sought to enjoin its use. The trial court declined to enter a preliminary injunction, without prejudice. Subsequently, the court denied Med South's motion to dismiss. Both parties moved for summary judgment. The trial court ruled in favor of Med South, concluding that the House Rule was not unconstitutional, but denied Med South's request for attorney's fees. Dublirer appealed the free speech issue, and Med South cross-appealed for attorney's fees. In an unpublished opinion issued in August 2011, the Appellate Division reversed and struck the House Rule on free speech grounds. The panel noted, in part, that Dublirer's expressional activity was "political-like speech" because it related to the management and governance of the common-interest community. The panel further found that the restriction was content-based and that it left Dublirer without reasonable alternative means to convey his message.

The Supreme Court granted Med South's petition for certification on the free speech and attorney's fees issues. The Court also granted the American Civil Liberties Union of New Jersey (ACLU) motion to appear as amicus curiae.

**HELD:** The Board of Directors' House Rule violates the free speech guarantee in New Jersey's Constitution. The important right of residents to speak about the governance of their community, which presents a minimal intrusion when a leaflet is placed under a neighbor's apartment door, outweighs the Board's concerns.

1

1.  The New Jersey Constitution guarantees a broad affirmative right to free speech. It bars the government from abridging free speech and also protects "against unreasonably restrictive or oppressive conduct on the part of private entities" in certain circumstances. State v. Schmid, 84 N.J. 535, 560 (1980). Schmid, and later N.J. Coal. Against War in the Middle East v. J.M.B. Realty Corp., 138 N.J. 326 (1994) (Coalition), explored restrictions on free speech that owners of private property, used by the public, imposed on visitors. In Schmid, the Court articulated a three-part test to examine the scope of free speech rights on privately owned property. The aim of the test was to determine when an owner of private property "may be required to permit" others to exercise free speech rights, "subject to suitable restrictions." Schmid, supra, 84 N.J. at 563. In Coalition, the Court applied the Schmid test to regional shopping centers that effectively banned leafleting on political and societal issues. Coalition, supra, 138 N.J. at 344. The Court pointedly added that it decided the case not based on Schmid alone but also "by the general balancing of expressional rights and private property rights." Id. at 362. (pp. 9-14)

2.  Two recent cases considered different concerns that exist when a private community restricts the free speech rights of one of its members. See Comm. for a Better Twin Rivers v. Twin Rivers Homeowners' Ass'n, 192 N.J. 344 (2007); Mazdabrook Commons Homeowners' Ass'n v. Khan, 210 N.J. 482 (2012). In Twin Rivers, the Court for the first time balanced the rights of fellow property owners in a common-interest community and applied both the three-part Schmid test and Coalition's general balancing test. In Mazdabrook, the Court, building on Twin Rivers, recognized that the Schmid test was not designed "for situations when the person seeking to exercise the right to free speech is not an outsider but a property owner as well – with both free speech and property rights." Mazdabrook, supra, 210 N.J. at 497-98. Both Twin Rivers and Mazdabrook noted that the Schmid/Coalition test was not a perfect fit for private residential communities. In those cases, courts should focus on "the purpose of the expressional activity undertaken" in relation to the property's use and should also consider the "general balancing of expressional rights and private property rights," see Coalition, supra, 138 N.J. at 362. To be clear, this approach applies when free speech restrictions are imposed on residents who enjoy property and free speech rights in a common-interest community. When an outsider seeks to speak on private property that belongs to another but is made available to the public, the Schmid/Coalition test will continue to apply. (pp. 14-19)

3.  Dublirer's message was akin to and should be treated as political speech, which is entitled to the highest level of protection in our society. Dublirer's proposed speech would interfere only minimally with the interests of the apartment building and its residents and is not incompatible with the nature of the private property where he and his neighbors dwell. Speech about governance is not incompatible with the place to be governed. If anything, speech about matters of public interest, and about the qualifications of people who hold positions of trust, lies at the heart of our societal values. See Mazdabrook, supra, 210 N.J. at 501. To assess the reasonableness of the Board's restriction, the Court considers whether convenient, feasible, and alternative means exist for Dublirer to "engage in substantially the same expressional activity." Schmid, supra, 84 N.J. at 563. Barring leaflets about political matters cannot be considered a minor restriction. The available alternatives are simply not substantially the same as presenting a leaflet to a neighbor. The Board can adopt reasonable time, place, and manner restrictions to serve the community's interest. See Mazdabrook, supra, 210 N.J. at 501. The Board, however, adopted no such limits. In addition, it does not appear that any written standards exist to guide the Board's discretion. Moreover, the Board allows itself to distribute materials throughout the complex, but its critics cannot do so. On balance, the Court finds that the restriction on Dublirer's right to disseminate his written materials to neighbors is unreasonable. Dublirer's right to promote his candidacy, and to communicate his views about the governance of the community in which he lives, outweigh the minor interference that neighbors will face from a leaflet under their door. In short, Dublirer's right to free speech outweighs the Board's concerns about the use of the apartment building. The Court therefore finds that the Board's House Rule violates the free speech guarantee in New Jersey's Constitution. (pp. 19-25)

The judgment of the Appellate Division as to plaintiff's free speech claim is **AFFIRMED**.

**JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in CHIEF JUSTICE RABNER's opinion. JUDGE CUFF (temporarily assigned) did not participate.**

ROBERT DUBLIRER,

    Plaintiff-Respondent,

        v.

2000 LINWOOD AVENUE OWNERS,
INC., DAVID HOCHSTADT, WAYNE
KOBY, THEODORE TOMASZEWICZ,
ETHEL BLUMENTHAL, SANDY
KOEPPEL, JUDITH ROSENTHAL and
JOSEPH VENTURA,

    Defendants-Appellants.

        Argued September 8, 2014 – Decided December 3, 2014

        On certification to the Superior Court,
        Appellate Division.

        Natalie H. Mantell argued the cause for
        appellants (Gibbons and Wolff & Samson,
        attorneys; George A. Spadoro, of counsel;
        Mr. Spadoro, Kevin McNulty, and Michael R.
        Griffinger, on the briefs).

        Robert Dublirer argued the cause pro se.

        Frank Askin argued the cause for amicus
        curiae American Civil Liberties Union of New
        Jersey (Rutgers Constitutional Litigation
        Clinic, attorneys).

    CHIEF JUSTICE RABNER delivered the opinion of the Court.

    In this appeal, we consider the free speech rights of

residents in a high-rise cooperative apartment building.  A

resident who was a regular critic of the building's Board of

Directors was interested in running for a Board seat.  He asked the Board if he could distribute campaign materials in the building.  The Board, citing a "House Rule" that barred soliciting and distributing any written materials, denied the request.  On prior occasions, though, the Board had distributed written "updates" under apartment doors throughout the building, which criticized the Board's opponents.  The resident filed a lawsuit and claimed that the House Rule was unconstitutional.

We now clarify the standard to evaluate restrictions on free speech in a common-interest community like the building in this case.  Some of this Court's earlier case law addressed the balance between the rights of owners of private property, used by the public, and the free speech rights of visitors.  See N.J. Coal. Against War in the Middle East v. J.M.B. Realty Corp., 138 N.J. 326 (1994), cert. denied, 516 U.S. 812, 116 S. Ct. 62, 113 L. Ed. 2d 25 (1995) (Coalition); State v. Schmid, 84 N.J. 535 (1980), appeal dismissed sub nom. Princeton Univ. v. Schmid, 455 U.S. 100, 102 S. Ct. 867, 70 L. Ed. 2d 855 (1982).

Different concerns arise when the speaker is an owner, not a visitor, who seeks to exercise the right to free speech in the common-interest community where he or she lives.  See Mazdabrook Commons Homeowners' Ass'n v. Khan, 210 N.J. 482, 498 (2012); Comm. for a Better Twin Rivers v. Twin Rivers Homeowners' Ass'n, 192 N.J. 344, 367 (2007).  In those cases, courts should focus

2

on "the purpose of the expressional activity . . . in relation to" the property's use, see Schmid, supra, 84 N.J. at 563, and conduct a more "general balancing of expressional rights and private property rights," Coalition, supra, 138 N.J. at 362.

Under that approach, we find that the Board's policy violates the free speech clause of the State Constitution. The important right of residents to speak about the governance of their community, which presents a minimal intrusion when a leaflet is placed under a neighbor's apartment door, outweighs the Board's concerns. We therefore affirm the judgment of the Appellate Division.

## I.

Defendant 2000 Linwood Avenue Owners, Inc., owns a high-rise apartment building in Fort Lee known as Mediterranean Towers South or Med South. Med South is home to about 1000 to 1200 residents who live in 483 units.

Med South is a private cooperative apartment building, commonly referred to as a "co-op." In a co-op arrangement, owners buy shares of a building and get a leasehold interest in a unit in the building. See 15B Am. Jur. 2d Condominiums and Cooperative Apartments § 56 (2014). Technically, residents do not own their apartments but occupy them as leaseholders.

Med South is governed by a Board of Directors. It has seven members who run for election each year and serve as

3

volunteers.  The Board has the power to adopt "House Rules" that apply to the community's living arrangement; current rules cover topics like deliveries, parking, the use of common areas, and requests for repairs.  The shareholders or residents of a common-interest community like Med South agree to be bound by the co-op's by-laws and rules.

Plaintiff Robert Dublirer bought shares in the co-op and became a resident in 2002.  He challenges a House Rule, adopted in 1987 and modified slightly in 1999, about solicitations and notices.  The House Rule reads as follows:

> SOLICITING / NOTICES
>
> There shall be no solicitation or distribution of any written materials anywhere upon the premises without authorization of the Board of Directors.
>
> Without prior consent of the Board of Directors, no sign or notice shall be placed upon the bulletin board, the mail room, in the halls, lobby, elevators or on the doorways.  A bulletin board for residents [sic] use is provided in the rear lobby.

According to the Board, the rule has two aims:  to preserve the residents' quiet enjoyment of their apartments and to cut down on litter or "paper pollution."

There are several exceptions to the House Rule.  The Board itself can place written materials under apartment doors.  The Board also allows the local police department, fire department, and ambulance corps to knock on residents' doors and solicit

donations during the Christmas holiday season.  In addition, the Board permits shareholders to knock on doors to solicit proxies for the annual shareholders' meeting, but shareholders may not discuss issues or candidates as they do so.

The first exception is noteworthy.  The Board distributes various documents under apartment doors:  bills; notices for repairs, testing of fire alarms, and the like; a copy of the annual audit; and letters or "updates" about issues of common interest.  Multiple examples of the Board's updates appear in the record.  The trial court charitably described them, in part, as "partisan material" that "attack[s]" the Board's "opponents." Indeed, on a number of occasions, the updates touted the Board's accomplishments and sharply challenged the credibility, competence, and motives of its critics.

For his part, Dublirer publishes the "Med South Gadfly," a newsletter that he distributes at public shareholder meetings twice a year.  In similarly strong language, the newsletters question whether the Board is financially irresponsible, incompetent, and possibly corrupt.

The House Rule bars Dublirer and others from placing a newsletter under a neighbor's door.  Residents can post items on the bulletin board in the rear lobby of the building and can distribute materials at two annual board meetings that shareholders attend.  Residents, of course, can also send

5

documents to fellow shareholders by regular mail, at a cost of more than $200 per mailing. In addition, residents may seek the Board's approval to place signs or notices in the building, but there do not appear to be any written guidelines to channel the Board's discretion.

On February 21, 2008, Dublirer advised the Board in a letter that he might run for election to the Board. He asked whether the House Rule that barred notices applied to campaign materials. The Board's attorney responded in writing two weeks later: "The rule is clear and prohibits distribution of any written materials without the authorization of the Board of Directors." After a few days, Dublirer wrote the Board and asked for permission "to distribute written campaign materials on the premises." The Board denied the request.

Dublirer filed a complaint in the Chancery Division on March 25, 2008. He challenged the House Rule against "posting notices and distributing written campaign materials" and sought to enjoin its use.[1] His complaint named Linwood Avenue Owners, Inc., and seven individuals who served on its Board of Directors as defendants.

---

[1] In addition, Dublirer sought relief in connection with an aspect of the co-op's election process, which is not part of this appeal. We also do not consider any recent changes to the rules to which the parties have referred. We rely on the rules and practices outlined in the summary judgment record.

6

After a hearing in April 2008, the trial court declined to enter a preliminary injunction without prejudice. Discovery followed. Four months later, the court denied defendants' motion to dismiss. Both parties moved for summary judgment in February 2009.

The trial court ruled in favor of Med South and concluded that the House Rule was not unconstitutional. The court explained that the rule was uniformly employed and that Dublirer had reasonable alternative methods to communicate. The trial court also denied Med South's request for attorney's fees because it found that the clause in the lease on that issue was ambiguous.

Dublirer appealed the free speech issue, and Med South cross-appealed for attorney's fees. In an unpublished opinion issued in August 2011, the Appellate Division reversed.

The appellate panel relied heavily on Twin Rivers and struck the House Rule on free speech grounds. The panel noted that Dublirer's expressional activity was "political-like speech" because it related to the management and governance of the common-interest community. The panel found that the restriction left Dublirer without reasonable alternative means to convey his message. The panel also observed that the restriction was content-based because Med South let charitable organizations contact residents but denied Dublirer the same

7

opportunity.  Because Med South did not prevail, the Appellate Division saw no reason to consider the cross-appeal for attorney's fees.

Med South petitioned this Court for certification on the free speech and attorney's fees issues.  We granted the petition.  We also granted the motion of the American Civil Liberties Union of New Jersey (ACLU) to appear as amicus curiae.

## II.

Med South argues that the judgment of the Appellate Division should be reversed for a number of reasons.  As a preliminary matter, Med South claims that the State Constitution's guarantee of free speech does not apply to a privately owned residential building.  If the constitutional protection applies, Med South maintains that prior precedent requires reversal.  The co-op argues that residents of a private building have the right to agree to create a home that is a refuge from litter and politics, and that their right to the quiet enjoyment of their property outweighs Dublirer's desire to place leaflets under residents' apartment doors.  Med South also claims that the Appellate Division failed to conduct the required balancing test under Twin Rivers.  The co-op argues, in the alternative, that the House Rule is a reasonable time, place, and manner regulation that affords Dublirer reasonable

8

alternatives.  In the wake of this Court's ruling in Mazdabrook, Med South argues that the decision compels reversal as well.

Dublirer contends that the Appellate Division should be affirmed because the House Rule violates his free speech rights. He argues that this Court's decision in Twin Rivers already applied the free speech protections in the State Constitution to a private residential community.  He submits that the Appellate Division properly applied the tests from Schmid and Coalition in this case.  Dublirer also highlights the importance of political speech about the governance of a community to its shareholders and owners.

The ACLU, represented by the Rutgers Constitutional Litigation Clinic, argues that Mazdabrook supports an affirmance.  Among other arguments, the organization contends that Dublirer's constitutional rights outweigh the interests of Med South and that the House Rule imposes an unfair restriction on the exercise of free speech.

III.

A.

The New Jersey Constitution guarantees a broad affirmative right to free speech:  "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right.  No law shall be passed to restrain or abridge the liberty of speech or of the press."  N.J. Const.

art. I, ¶ 6. That guarantee is one of the broadest in the nation, see Mazdabrook, supra, 210 N.J. at 492 (citing Green Party v. Hartz Mountain Indus., Inc., 164 N.J. 127, 145 (2000)), and it affords greater protection than the First Amendment, see Coalition, supra, 138 N.J. at 352. Federal law requires "state action" to invoke the First Amendment. See U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech . . . ."); Twin Rivers, supra, 192 N.J. at 356. The State Constitution does not. Mazdabrook, supra, 210 N.J. at 493.

As this Court explained in Schmid, the New Jersey Constitution bars the government from abridging free speech and also protects "against unreasonably restrictive or oppressive conduct on the part of private entities" in certain circumstances. Schmid, supra, 84 N.J. at 560. Schmid and Coalition explored restrictions on free speech that owners of private property, used by the public, imposed on visitors. Two recent cases, Twin Rivers and Mazdabrook, considered different concerns that exist when a private community restricts the free speech rights of one of its members. In that situation, the speaker is not an outsider but a property owner who enjoys both property and free speech rights. Mazdabrook, supra, 210 N.J. at 497-98. In both settings, the Court examined whether limits on

10

an individual's right of expression on private property ran afoul of the Constitution's guarantee of free speech.

We turn first to familiar cases that address the free speech rights of outsiders who seek to speak on private property. In Schmid, supra, the Court considered the question of free speech on the campus of a private university. Princeton University regulations in effect at the time required off-campus groups to get advance permission to hand out materials on school grounds. 84 N.J. at 538. Schmid, who was not a student, tried to distribute political materials on the main campus and was arrested and convicted for trespass. Ibid.

In overturning the conviction, the Court articulated a three-part test to examine the scope of free speech rights on privately owned property. That standard considers

> (1) the nature, purposes, and primary use of such private property, generally, its "normal" use, (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property.
>
> [Id. at 563.]

The aim of the test was to determine when an owner of private property "may be required to permit" others to exercise free speech rights, "subject to suitable restrictions." Ibid.

11

The Court applied the test and found that (1) the primary use of the University's private property was for education, (2) the University endorsed the "value of an open campus and the full exposure of the college community to the 'outside world,'" and (3) Schmid's activities were "not incompatible with either Princeton University's professed educational goals or the University's overall use of its property for educational purposes." Id. at 564-65.

Even if a visitor can satisfy the standard, the Court noted that property owners can "fashion reasonable rules to control . . . expressional rights" of others on their property. Id. at 563. To assess the reasonableness of a restriction, courts look to whether "convenient and feasible alternative means" of free speech exist, ibid., and whether the owner has reasonable standards in place to protect the legitimate interests of the parties, id. at 563, 567. The Court concluded that the University violated Schmid's state constitutional rights because it lacked a reasonable regulatory scheme. Id. at 567.

Fourteen years later, in Coalition, the Court applied the Schmid test to regional shopping centers that effectively banned leafleting on political and societal issues. Coalition, supra, 138 N.J. at 344. Once again, the dispute pitted owners of private property -- ten very large shopping centers -- against individuals who tried to distribute leaflets in the malls in

12

opposition to military intervention in the Persian Gulf. Coalition, supra, 138 N.J. at 336. The malls denied access. Some refused to allow the individuals to leaflet; others imposed conditions that "made it difficult . . . to reach the public." Id. at 337.

The Court likened the private malls to a public square or downtown business district. Id. at 363. Tracking the factors in Schmid, the Court found that the purpose of the private property was not only commercial but also "all-embracing," in the tradition of a downtown business district; that the public's invitation to use the malls was broad; and that the free speech in question was "no more discordant" with the uses of the property than leafleting that had gone on in downtown business districts for centuries. Id. at 333-34. All three factors, therefore, favored individual free speech rights over the owners' property interests. Id. at 334.

The Court pointedly added that it decided the case not based on Schmid alone but also "by the general balancing of expressional rights and private property rights." Id. at 362. The Schmid test, the Court explained, was "specifically designed with that balancing in mind." Ibid. Under the newly described standard, the Court weighed "the private property owners' interest in controlling and limiting activities on their property" and the protest group's free speech interest, "the

13

most substantial in our constitutional scheme." Id. at 363. The balance, once again, favored "expressional rights . . . over . . . private property interests." Id. at 365. The malls' owners were free to adopt reasonable time, place, and manner restrictions to regulate the leafleting and make sure it did not interfere with the shopping centers' business. Id. at 362.

In Twin Rivers, the Court for the first time balanced the rights of fellow property owners in a common-interest community. Twin Rivers involved a large planned development of private dwellings, which was governed by a homeowners' association. Twin Rivers, supra, 192 N.J. at 350. To avoid clutter and preserve the aesthetic value of the common areas, the association adopted a sign policy that allowed residents to post no more than one sign per lawn and one per window. Id. at 351. Unlike in this case, though, the residents could "walk through the neighborhood, ring the doorbells of their neighbors, and advance their views." Id. at 368.

A group of residents claimed the sign policy violated their free speech rights and challenged it in court. Id. at 351. The dispute thus involved homeowners in a private community, not outsiders, and restrictions on the use of both common areas and the homeowners' individual properties. The Court made note of this "additional complication" and applied both the three-part Schmid test and Coalition's general balancing test. Id. at 365.

14

The Court found that the first two Schmid factors weighed in favor of the association, a private residential community that had "not invited the public to use its property." Id. at 366. The third factor, the Court explained, essentially "look[ed] to the fairness of the restrictions imposed . . . in relation to plaintiffs' free speech rights." Id. at 366-67.

Because the restrictions were minor and reasonable, and "allowed expressional activities to take place," the Court concluded that the restrictions satisfied the "Schmid/Coalition test" and did not violate the State Constitution. Id. at 367-68. The Court stressed that its holding "does not suggest . . . that residents of a homeowners' association may never successfully seek constitutional redress against a governing association that unreasonably infringes their free speech rights." Id. at 368-69.

Mazdabrook returned to that question and addressed efforts by a homeowners' association to prohibit speech by one of its members. The defendant, Wasim Khan, owned a townhouse in a private common-interest community of 194 townhomes. Mazdabrook, supra, 210 N.J. at 487. He placed signs in the front window and inside the front door of his townhouse in support of his candidacy for town council. Id. at 488. The homeowners' association, in turn, ordered Khan to remove the signs because they violated an association rule banning all residential signs

15

except "For Sale" signs.  Ibid.  That rule was part of the association's legitimate effort to maintain "the architectural design and aesthetic appeal" of the common-interest community of townhomes.  Id. at 503.

The Court, building on Twin Rivers, recognized that the Schmid test was not designed "for situations when the person seeking to exercise the right to free speech is not an outsider but a property owner as well -- with both free speech and property rights."  Id. at 497-98.  In response, the Court made two adjustments to the analytical framework in such cases:  it enhanced the weight of the third Schmid factor and "elevate[d] the importance of the general balancing test" in Coalition.  Id. at 498.

Under both tests, the Court concluded that the near-complete ban on signs violated the homeowner's free speech rights.  Id. at 503.  The policy "hamper[ed] the most basic right to speak about the political process and [Khan's] own candidacy for office."  Id. at 501.  Yet the Court found "only minimal interference with the [a]ssociation's property or common areas" because people could choose to view or ignore the signs.  Ibid.  The Court concluded that Khan's right to free speech outweighed the association's property interest.  Id. at 504.

The Court again noted that a homeowners' association has the power to adopt reasonable time, place, and manner

16

restrictions.  <u>Id.</u> at 501.  It could place reasonable limits on the number, location, and size of signs to serve the community's aesthetic interests.  <u>Id.</u> at 501-02.  The association's blanket ban on signs, however, left Khan without adequate, comparable alternatives for his message.  <u>Id.</u> at 502.  The Court also critiqued the board of directors' "unfettered discretion" to grant or deny a request to post a sign.  <u>Ibid.</u>  No written standards existed to guide the board.  <u>Ibid.</u>

We distill a number of principles from those cases.  When owners of private property, open to public use, attempt to limit free speech and assembly rights of others, the <u>Schmid</u>/<u>Coalition</u> test provides a way to balance both sides' interests and assess the reasonableness of the restrictions.  The test was designed to evaluate a person's free speech rights on property belonging to another -- a university campus in <u>Schmid</u> and a shopping mall in <u>Coalition</u>.

More recent case law addresses a different situation:  when the governing board of a common-interest community attempts to restrict speech by its fellow members.  In that setting, the speakers are not outsiders; they live in the community and have both property and free speech rights there.

Med South contends that <u>Twin Rivers</u> "denied the applicability" of the State Constitution to a residential, planned development.  It did not.  The opinion applied the

17

standards outlined in Schmid and Coalition to a private common-interest community and found no violation of the right to free speech under the facts of the case. Twin Rivers, supra, 192 N.J. at 366-68. Mazdabrook followed the same course and reached the opposite result on different facts. Mazdabrook, supra, 210 N.J. at 499-504.

Both decisions, though, noted that the Schmid/Coalition test was not a perfect fit for private residential communities. The first prong of the Schmid test, for example, is largely subsumed by the issue itself. In the case of restrictions imposed by the board of a private common-interest community of dwellings, the primary nature and use of the property, by definition, is private. The second prong -- the extent of the public's invitation to use the property -- is even less relevant because residents do not need an invitation to use property in their own community. This appeal underscores both concerns: Dublirer is a resident and owner in a private co-op; he is not an outsider who has been invited to the building.

For those reasons, we now clarify the standard to evaluate restrictions on the right to free speech and assembly for residents of a private common-interest community. In those instances, courts should focus on "the purpose of the expressional activity undertaken" in relation to the property's use, an inquiry adapted from Schmid, supra, 84 N.J. at 563, and

18

should also consider the "general balancing of expressional rights and private property rights," see Coalition, supra, 138 N.J. at 362. Both standards look to similar factors to determine "the fairness of the restrictions imposed" with regard to the residents' free speech rights. Twin Rivers, supra, 192 N.J. at 366-67.

To be clear, this approach applies when free speech restrictions are imposed on residents who enjoy property and free speech rights in a common-interest community. When an outsider seeks to speak on private property that belongs to another but is made available to the public, the Schmid/Coalition test will continue to apply.

B.

We now consider the constitutionality of the House Rule under the above standard. We start by examining the purpose of Dublirer's speech.

Dublirer sought to be elected to the Board of Directors of the co-op. His message related to the governance of the residential community in which he lived. Thus, even though Dublirer did not run for public office, his message was akin to and should be treated as political speech, which is entitled to the highest level of protection in our society. See Mazdabrook, supra, 210 N.J. at 499 ("[P]olitical speech . . . lies 'at the core' of our [State's] constitutional free speech protections.")

19

(citations omitted); State v. Miller, 83 N.J. 402, 411 (1980) (noting political speech "occupies a preferred position in our constitutionally-protected interests"); see also Verna v. Links at Valleybrook Neighborhood Ass'n, Inc., 371 N.J. Super. 77, 98 (App. Div. 2004) (finding that candidate for board of directors of homeowners' association "should be deemed a limited purpose public figure" in defamation context because position is "essentially indistinguishable from a member of a town's governing body"). Also, as we noted in Mazdabrook, "[f]ree speech protections assume particular importance in the context of a person campaigning" for office. Mazdabrook, supra, 210 N.J. at 499.

We thus turn to the purpose of the restricted speech in relation to the use of the property. See Schmid, supra, 84 N.J. at 563. Med South is a private residential community in which all shareholders agree to be bound by certain rules for the benefit of the entire community. See Twin Rivers, supra, 192 N.J. at 367 (noting that "mutual benefit and reciprocal nature" of rules and regulations are "essential to the fundamental nature of the communal living arrangement"). We recognize the importance of house rules in a co-op building like Med South, where apartments share walls and ceilings and are connected by common spaces.

Med South's House Rules, in general, are designed to promote the residents' quiet enjoyment of their property. Med South represents that the rule in question is also meant to preserve privacy and minimize litter in the building. That said, Dublirer's proposed speech would interfere only minimally with the interests of the apartment building and its residents. Dublirer did not seek approval to use a bullhorn or a loudspeaker, or to erect a large sign in the lobby. And residents could simply ignore or throw away any literature he placed under their doors. We are also not persuaded by Med South's argument that its notices do not create clutter yet other notices would.

In any event, Dublirer's proposed speech is not incompatible with the nature of the private property where he and his neighbors dwell. Speech about governance is not incompatible with the place to be governed. Cf. Coalition, supra, 138 N.J. at 375 (suggesting that commercial speech could be incompatible with shopping center if, for example, it encouraged shoppers to go elsewhere). If anything, speech about matters of public interest, and about the qualifications of people who hold positions of trust, lies at the heart of our societal values. See Mazdabrook, supra, 210 N.J. at 501.

To assess the reasonableness of the Board's restriction, we consider whether convenient, feasible, and alternative means

21

exist for Dublirer to "engage in substantially the same expressional activity." Schmid, supra, 84 N.J. at 563. Med South notes that Dublirer can post materials on a bulletin board in the rear lobby of the building and can distribute information at two annual board meetings. He can also use the postal system to send mailings at a cost of more than $200 per mailing.

Dublirer instead sought permission to speak directly to the audience he needed to reach: the voting members of the community who were his neighbors. As the Supreme Court noted in a different setting, "a person who puts up a sign at her residence often intends to reach neighbors, an audience that could not be reached nearly as well by other means." City of Ladue v. Gilleo, 512 U.S. 43, 57, 114 S. Ct. 2038, 2045, 129 L. Ed. 2d 36, 48-49 (1994). The same is true in this case. In addition, Dublirer sought to communicate with fellow co-op members in the most direct and least expensive way possible -- by placing written campaign materials under the door of each apartment. Barring leaflets about political matters cannot be considered a minor restriction. The available alternatives are simply not substantially the same as presenting a leaflet to a neighbor.

The Board can adopt reasonable time, place, and manner restrictions to serve the community's interest. See Mazdabrook, supra, 210 N.J. at 501. For example, it could reasonably limit

22

the number of written materials that an apartment dweller can distribute in a given period. The Board could also reasonably limit the hours of distribution to prevent early morning or late evening activities. Cf. Twin Rivers, supra, 192 N.J. at 368 (upholding restrictions on number and location of political signs). Those types of restrictions would promote the quiet enjoyment of residents of the apartment complex without unreasonably interfering with free speech rights.

The Board, though, adopted no such limits. It instead banned the distribution of all written materials "anywhere upon the premises without written authorization of the Board of Directors," except for a single bulletin board in the rear lobby. It does not appear that any written standards exist to guide the Board's discretion. That situation has the natural effect of chilling speech. Once again, we caution that "[r]easonable restrictions should be clearly written in advance and made known to the relevant community," Mazdabrook, supra, 210 N.J. at 502; see also Schmid, supra, 84 N.J. at 567, so that written criteria can guide a board's discretion.

There are certain exceptions to the House Rule. The most glaring one depends on who the speaker is: the Board allows itself to distribute materials throughout the complex, but its critics cannot do so. As the excerpts in the record reveal, parts of the Board's updates praise its achievements and harshly

23

criticize its opponents.  But the Board prohibits detractors from answering in the same manner.

The Board's technical argument that it is not bound by the House Rule because it has not signed a lease misses the mark. Nothing in our case law permits a group in power to attack its opponents yet bar them from responding in the same way.  "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based."  State v. DeAngelo, 197 N.J. 478, 487 (2009) (quoting Turner Broad. Sys. v. FCC, 512 U.S. 622, 643, 114 S. Ct. 2445, 2459, 129 L. Ed. 2d 497, 518 (1994)). Here, the way the Board has implemented the House Rule renders it content-based.  But even if the Board stopped criticizing its adversaries in the updates it distributes, it still could not prevent critics from speaking out about important affairs of governance in the manner sought here.  As in Mazdabrook, we note that our decision is not based on a finding of content-based discrimination.  See Mazdabrook, supra, 210 N.J. at 504-05.

The Board also permits the local police, firefighters, and ambulance corps to solicit charitable contributions in the apartment complex at the same time it bans residents from soliciting for political purposes.  However noble the impulse, that practice also limits the right of free expression based on the speaker and the content of the message.

24

On balance, we find that the restriction on Dublirer's right to disseminate his written materials to neighbors is unreasonable. Dublirer's right to promote his candidacy, and to communicate his views about the governance of the community in which he lives, outweigh the minor interference that neighbors will face from a leaflet under their door. In short, Dublirer's right to free speech outweighs the Board's concerns about the use of the apartment building. We therefore find that the Board's House Rule violates the free speech guarantee in New Jersey's Constitution.

We do not side with either Dublirer or the Board in their dispute. We simply uphold the constitutional right that affords both the right to speak.

IV.

In light of our ruling, we do not address two other issues. Because the Board is not a prevailing party, we do not consider its request for attorney's fees under its lease with Dublirer. See Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 385 (2009); N. Bergen Rex Transp., Inc. v. Trailer Leasing Co., 158 N.J. 561, 570 (1999).

We also do not consider whether the House Rule is contrary to the Planned Real Estate Development Full Disclosure Act, N.J.S.A. 45:22A-44(b), an argument that only the ACLU has mentioned. See State v. O'Driscoll, 215 N.J. 461, 479 (2013)

25

("[A]s a general rule, an amicus curiae must accept the case before the court as presented by the parties and cannot raise issues not raised by the parties.") (citation omitted); Bethlehem Twp. Bd. of Educ. v. Bethlehem Twp. Educ. Ass'n, 91 N.J. 38, 48-49 (1982).

V.

For the reasons set forth above, we affirm the judgment of the Appellate Division as to Dublirer's free speech claim.

JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in CHIEF JUSTICE RABNER's opinion.  JUDGE CUFF (temporarily assigned) did not participate.

SUPREME COURT OF NEW JERSEY

NO.    A-125                           SEPTEMBER TERM 2011

ON CERTIFICATION TO      Appellate Division, Superior Court


ROBERT DUBLIRER,

      Plaintiff-Respondent,

          v.

2000 LINWOOD AVENUE OWNERS,
INC., DAVID HOCHSTADT, WAYNE
KOBY, THEODORE TOMASZEWICZ,
ETHEL BLUMENTHAL, SANDY
KOEPPEL, JUDITH ROSENTHAL and
JOSEPH VENTURA,

      Defendants-Appellants.



DECIDED            December 3, 2014
         Chief Justice Rabner              PRESIDING

OPINION BY            Chief Justice Rabner

CONCURRING/DISSENTING OPINIONS BY

DISSENTING OPINION BY


| CHECKLIST | AFFIRM | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | --------------------- | ------------------ |
| TOTALS | 6 | |

1